We're happy to hear your argument in our third case, United States v. St. Louis, whenever the lawyers are ready. Good morning, Your Honors. My name is Nader Hassan. I am from Fairfax, Virginia, and I represent the appellant Monclaire Saint Louis. Mr. St. Louis never stepped foot in the United States. He was extradited here. The only exposure he's had to the criminal justice system was sitting in the Alexandria City Jail and then sitting in a courtroom for trial. We believe the district court erred in not granting a mistrial when mention of a rape that occurred collaterally to the kidnapping allegations was introduced to the trier as a fact. Your Honors, a rape is not something that can be erased from a juror's mind, especially after they have seen the victim and have seen the emotional dynamic of that victim. And then to hear the words rape come out of a criminal co-defendant who's been convicted, that rang the bell. And the government refers to it as a blip. And I submit to the court blips are not precluded from trials, and they're sustained in motions and limited. Blips are not something judges identify as highly prejudicial prior to the trial. Blips don't need a judge to disregard and state that it's a good thing there was follow-up to say that your clients weren't the perpetrators in the trial. But aren't our cases, Legion, that say that a defendant is not entitled to a perfect trial but a fair one? And what could this trial court have done other than what it did do to ameliorate any poison from that improper behavior? There was none. There was at that point when you see, again, what we refer to as a blip, and some of the things that are on the record, a blip doesn't change the expression of jurors' faces. It doesn't change their demeanor. It doesn't make the clerk sitting next to the So are you saying that all of that is in the record? No, it's not in the record. So why are you talking about that? The point being is that when the court is asking, what can you do to cure, my point is that when all of these things have already happened, once the development But you seem to be, I just want to be clear, none of that actually, you don't have any evidence to support what you just described. You're just speculating as to what No, but it is in the record that this blip required the government's attorney to raise his voice over his own witness, which also, again, I would submit is clear on the record to show that that, and even the court mentioned, you raised your voice loud enough so that they couldn't hear that, but yet the court record specifically shows that. He withdrew the question. The prosecutor withdrew the question. He withdrew the question, but again, the bell was rung and it continued to ring for the follow-up. And that's where I think the case law comes in is that when something like that happens and is so prejudicial over any probative value, it changes the dynamic for the defense attorney and his strategy for defense. When you have a client who doesn't speak the language, has never been here, and hears a court say, you can't say that, and it gets said in front of him in trial, and the interpreter interprets that for him, it's very difficult as a defense attorney to think, this guy is not going to take the stand if I call him and stay focused and instead try to defend himself against that allegation, which is not supposed to be discussed. The allegation was not against him. It was not. He wouldn't have to defend himself against that. Again, the risk, because it came out and the bell was rung, whether or not my client would sit there and think that he needs to defend himself is an issue, and you can see in the transcript specifically, I needed time to speak with my client about whether or not he was going to take the stand afterwards. Is there any affidavit or other evidence that he didn't take the stand because of this exchange? No, I don't think that's... The only question the colloquy of the court asks is, have you spoken with your attorney after those? You're saying that if the district court does everything it possibly can to give a fair trial, and a cooperating witness says the wrong thing at some point, and then the district court does everything it possibly can to cure that and to take that out of the case, that there's just no, it's a per se... No, the case law does say that there's other, and it's through discretion, but the question is, did it cure? And did it cure... So my original question to you is, what, other than what the trial court did, what else could it have done to cure that? And if your answer is no, isn't that a per se standard? No, because it's specific to these facts. Under this case facts as to what was going on, the dynamic, the witnesses beforehand, the leading up, the dynamic that occurs during that point, at what point, and this is towards the end of the trial. I mean, this is their grand witness, the co-defendant comes and testifies. And he's testifying, and the testimony is going in about how the Haitian jail, the prison during the earthquake, and everybody ran away, and whether or not they escaped or not. And so it's riveting testimony for these jurors. And all of a sudden for that man to say, and then they raped her, and have the prosecutor jump... The assault. Assault, right? Assault. That was clear, and the bell was rung. And then the follow-up questions that, okay, well, these guys here didn't have anything to do with that, right? Clearly shows and gives the court an indicia that something was wrong. Or else that wasn't necessary. I think your time has expired. You can take some of your colleagues' time. No, I think that's all. But I would just, if I may just... I think the Helton language at the end was that it's true, even evidence of guilt being overwhelming, just as Harlan states in Boyd, United States v. Boyd, however deprived and full of crime, defendants are entitled to a fair trial, competent evidence, and the charges that they're charged with, the appropriate charges. Thank you. Thank you. Thank you. May it please the court. Vernita Archeney, counsel for Appellant Uris Tulin. If I may, if I can just finish up with that last issue, speaking with respect to the evidence of rape coming in, even though there was a pretrial motion, motion eliminated, that was granted, that was allowed to go in. To your Honor's question about what's in the record, I think the court has to look at the totality and a whole. And what we have in this record is we have the testimony of Ms. Marcellin, who is the aunt of the alleged rape victim, who is Ms. Auburn, who testified competently about an assault. And there was an issue with what she was saying in her testimony. And then you have Ms. Auburn, who is the alleged rape victim in this case. And the record, although it doesn't specifically state in the record that she was crying, on the witness, even though she's done with her testimony, she keeps saying, I'm sorry. The court keeps telling her it's fine and she can leave. And then you see in the record the court interpreter asking permission of the court, can she help the witness out of the courtroom. Now, obviously, the record doesn't have the same drama as what actually happened in the courtroom, but it was pretty dramatic. But that was not the witness that inadvertently said the prohibited word. It is not, but she is the alleged rape victim, Your Honor. So then we have the witness of Sampson-Jobois, who is the co-conspirator, who was the final witness in the government's case. And we had already addressed, again with the court, the issue of not making sure that no evidence of this rape came out of a witness. And then Sampson-Jobois actually said the words. So, Your Honor, so what I would say is that you have to take the whole record in its totality. And we understand that this court can't sit in the place of a trial court at that time, but that evidence obviously was heard and we believe considered by the jury and extremely prejudicial to your question about what the court should have done. And I think given all of that, the court should have ordered a mistrial in this particular place. It was, we were unable to unring that bell at that point. We had one, we had essentially three witnesses that talked about an assault. We had one witness that talked about someone pulling up their pants. We had another witness that actually used the words. And then you have the actual alleged rape victim, Ms. Auburn, who was unconsolable in court. But what the record will reflect is that she needed help coming out of the courtroom. So I believe on the record of all of that, the court should have granted our motion for a mistrial, taking into account its previous comments that the reason why the court was not going to allow any of this information to come in is because it was not intrinsic to the case. It was not relevant to the case. And it was highly prejudicial to the defendants in this particular case. So if I can move on to another important issue that came up in the case, and that was the issue with the identification evidence with respect to Mr. Tulin. Essentially, the evidence against Mr. Tulin in this particular case came down to identification evidence that came out through Agent Watson, none of the alleged kidnapping victims, and also the co-conspirator, Samson Jogwa. So in this particular case, due process was violated in the sense that the procedure for identification, the photo array procedure for identification for Mr. Tulin was impermissibly suggestive and unfair for Mr. Tulin. And then on top of that, we had the erroneous hearsay evidence that came in through Agent Watson. So first let me address the photo array and a little bit of facts as well. As the court understands, all these events happened in Haiti, before Haiti, as a matter of fact, back in 2012. When the kidnappings happened, the FBI went down and did an investigation. But prior to that, the Haitian authorities did an investigation. And when Ms. Fergile was recovered by the Haitian authorities, she was shown a rap poster from the Michon Squad, and that's in a supplemental appendix. I believe it's Government Exhibit 16. And in that poster, she identified two people. She identified Top MST, which is Montclair, St. Louis, and she identified a gentleman named Mr. Poisson, whose name was on his photo in the rap poster. She did not identify Mr. Tulin, who was also part of that rap poster. Three months later, the FBI interviews Ms. Fergile in New York and puts together a photo array. And in that photo array, they essentially lift or cut and paste the photograph or the headshot of Mr. Tulin in a digitized way and essentially put it in a photo array. That's Government Exhibit, I believe, 6, which is in the supplemental joint appendix. That photo array was substantially different than the other two photo arrays that Ms. Fergile was shown that day, in the sense that Mr. Tulin's picture was the only picture that was essentially lifted or taken from this rap poster. The photo that she was shown of Mr. Montclair, St. Louis, was a photograph that was actually taken of him. And the photograph that she was shown of Samson Jolbois, who was also in the photo array, was also an actual photograph that was taken of him. Now, the government will say that they had no other resources to get a photo of Mr. Tulin. However, the evidence came out and it's in the record that by Haitian law, every citizen has a photo identification card. And the FBI certainly could have gotten that photo and used that photo. They also could have received photos from the other advertisements or publicity images that the rap group had. But instead, what they did is they just used the exact same photograph, so it was a photograph that Ms. Fergile had already seen before, and recycled that photograph in a digitized way to use it in its photo array. So, I know you've got a little bit more with respect to this than just that way the array was set up. But if that's all that you have in this record, is that enough to suggest that this was unduly suggested? I think yes, in the way that the photo array was set up as well. And also, when you look at the factors, if we just go through the factors, under the bright white factors, you have the opportunity, this goes to the reliability, but I think the court can take all that into consideration. The opportunity to view suspects, there was no evidence that she actually saw his face. The degree of attention at the time, we would submit there was no degree of attention because she didn't see his face and wasn't able to make the identification at the time that she was recovered by the Haitian authorities. The accuracy of the initial description of the suspect, she was never asked or submitted a description of the suspects, and nor when she was interviewed by the FBI three months later, did the FBI agent ask her ahead of time, could you please give a description of the suspects in any kind of way? Also, her level of certainty. The government and the FBI took no confidence level testing with her to determine if she's 100% sure, 30% sure, 40% sure it was him. As a matter of fact, the record shows that it's our, what we submit is that she did not positively identify Mr. Tula in the photo array. What she said was, I've seen him before in the rap poster. And so that was the basis of the identification, not that he was the suspect for one of the assailants in the kidnapping group. And then the length of time between the crime and the identification. What was that length of time? So on the ground when she was in Haiti, it was immediately. She was recovered, and it was an immediate identification for the rap poster. When it was the FBI agent photo array, it was three months later. And with the photo array itself, and I would invite the court to please look at the supplemental appendix again after this argument. But you can see that Mr. Tula's image is significantly distorted from the rest of the images in his photo array. I actually did try to see that, and I couldn't see that it was significantly distorted. I would submit to Your Honor that his photo is pixelated. It's not an actual photograph. You have us where on the JA this is? Yes, Your Honor. It is the supplemental appendix. And it is pages 191 through 197. And I believe Mr. Tula's photo array is 1,197. Mr. Tula's photo array would be government exhibit number 6, which I believe is on 1,197 of the joint appendix, the supplemental joint appendix. His image is pixelated. It's essentially a cut and paste of the headshot from the poster, where the other images are actual photographs that are being used. Additionally, his image is much darker than the rest of the images, which essentially gives him a more menacing appearance in our opinion. And so if you compare it to the other photo arrays that she looked at that day, the photo array of Sainte-Georgette Bois and the photo array of Montclair St. Louis, you can see that their images were much clearer, that the defendants that were put in the composite most closely resembled those defendants as well. And again, Your Honor, again, our position is that she didn't identify Mr. Tula, and she just referenced the fact that she saw the photograph before, when she was shown the rap poster by the Haitian authorities. She also didn't identify him at trial. She did not. And if I can move to this other point, because I'm coming short of my time, she did not. How the evidence of the testimony of the identification came in, it came in through Agent Watson. And the government is relying on Rule 801D1C to say that, essentially, it's non-hearsay testimony. We objected to that, and we obviously filed pre-trial motions that were denied, but we objected to that. Agent Watson was one of the first witnesses that the government testified to. There was no evidence from Ms. Ferger at this point about the identification, or whether or not she was able to do identification, or if she could do an in-court identification. Simply put, the government put their agent on, and essentially just tried to get in, or successfully was able to get in, the identification evidence. Isn't that what 801D1C is designed to do? Your Honor, I would respectfully submit there are some prerequisites first. And I would respectfully submit that, one, the witness, it comes in once the witness is unable to make the identification. In cases that I've reviewed, most of these people have memory loss, because of some kind of significant injury. There's no limitation on that in Rule 801D1C? The rule doesn't specifically say, but if you take this rule and compare it with the other rules dealing with prior consistent statements, there is an order to the evidence. And when there is a witness that's unable to provide a statement, and there's another witness that can go back and put the statement in based on prior recorded recollection, there's an order as to how that happens. As to the other rules, but not as to this one? I would submit that the rule is silent, but I would submit that basic order requires that it follows that way. And she did ultimately testify in the trial? She did ultimately testify, and the government did not specifically ask her about the identification of Mr. Tulin, nor did they have her do an identification of Mr. Tulin in court. And neither did the defense? Well, Your Honor, no, the defense did not do that. The defense did not do that. In addition to questioning, did the defense put on evidence in the case? No, Your Honor. Well, Your Honor, the defense called Agent Watson to rebut some of the statements of Sampson, Joe, and so essentially that evidence did come in as part of the defense case. I am coming close to my time.  It has, Your Honor. Yes. May it please the Court, this case is unique among many prior identification cases that come before this Court in that the victim, Ms. Fergill, is held for a week. This is not a bank robbery where there are considerable concerns where a teller only sees the suspect for a moment. This is not a faller where Judge Traxler noted that the person in a restaurant adjoining the Howard Johnson only looked through the glass for a few moments. Ms. Fergill is held for seven days. And unlike common kidnappings or abductions, she's held in the room with her abductors. And they are not isolating her. She is having conversations with them, and they are detailed conversations about the negotiations, about the amount of money. She's even allowed to get on the phone to talk to her family to encourage her release. This goes on for days. And so you have an identification situation where I would argue it's almost impossible to conceive of a situation where a spread is unduly suggestive. However, I was not aware that our joint appendix was filed and everything was black. Obviously, there's a discretionary review of the district court. He found the spread not to be, Judge O'Grady, found the spread not to be unduly suggestive. Do you have the array that it's subjected to? Because I have a bunch of different arrays, and I want to be sure that I have the correct one. Yeah, I do. I don't know the actual procedures. I'm such an infrequent visitor to this court. Okay. Just tell me. It's the same array. It's this one, Your Honor. It would look like this. I've shown this to defense counsel if that record could reflect. Well, are there many copies? There's three. Are they all the same array? There are three, Your Honor. The first one is the cooperator, and Ms. Fergill was unable to identify the cooperator. I think that should give this court some comfort that she didn't just fix it. That's at 1193. Is that right? Yes, Your Honor.  1191. I'm sorry, Your Honor. I said yes too fast. 1191 is Mr. Jobois. No identification is made. That's the first spread she's seen. Okay. What about the 1193 one? The 1193 is Mr. Hassan's client, Mr. St. Louis, and he is sitting at the top, and you can see the victim has initialed and dated back in September of 2012. Okay. And then the final one, which is the one that is the subject of this appeal, is Mr. Tulin, who the victim, Ms. Fergill, has initialed. It is 1195. And he's the fourth individual. He is the fourth individual. Right beneath it is her initials, YF. Okay. She has made only two identifications, three spreads. And I want to be clear. Let me ask. So, Mr. Counsel, you make a lot of valid points about the length of time that the victim had to observe all of these folks, and all of that is, I don't dispute that. But the bottom line is when she was shown the poster right after the incident, she didn't identify Mr. Tulin. I know you dispute that. You have some suggestion that perhaps she made a mistake, but she didn't. And then three months later, she identifies Mr. Tulin and then says, I remember him because he was in the poster. I find that very troubling. Of course, it shouldn't be. It's a similar situation where agents are using the same photograph multiple times and they have some urgency. And I would dispute with the appellant that there is urgency in this case. While it is true the cooperator and Mr. St. Louis were in custody, Mr. Tulin is not in custody on September of 2012 when the spread is shown to Ms. Fergal. Recall the agent arrives because of Ms. Marcelin's abduction in July of 2012. While in Haiti, he learns of the earlier American who was taken, and then she has already returned to the United States. He then, as quickly as he can, within a month, he gets up there, shows her a spread. He did not know a poster was done. And, Your Honor, specifically to your poster question, the poster is a commercial product. This is not bank footage. This is not an arrest photograph. Nor, just to defend the Haitians if I could for a moment, it is not family photographs taken from the house where she's held. It is a commercial music poster promoting a band where people are showing. The continence of this individual is not in any way inculpatory. Judge O'Grady said and found at the lower court that the continence of the individual, if anything, it just required a witness to look closer at this photograph. There was nothing about the continence. Saunders from the Fourth Circuit says jarring when they make, and we're the ones who put that into a footnote. It wasn't an appellant's brief. But this is not a jarring photograph. It is then true, come to the trial, the spread is in. I ask her, do you recognize anyone in the courtroom? She identifies St. Louis. I say, anyone else? She does not make any other identification. The parties argued to the jury those facts because the dreadlocks are gone. The man who took her is dreadlocks. The spread clearly has all six individuals. You may have misunderstood my question. I'm not necessarily criticizing the FBI agent for using the excerpt from the rap poster in the array. I think they did as good a job as they could to make sure that it didn't unduly stand out. What I'm concerned about is she identifies Mr. Tulin in the array, and then she says the reason I remember that is not because he was one of the assailants, but I saw him in that poster, which suggests that she's transferring a recollection of the poster to this array. Don't you find that troubling? That sentence would trouble me a great deal because I would have driven down here thinking I was going to get reversed. Your Honor, the sentence, the testimony at record, the agent said she looks at the spread. She identifies two out of three in sequence one, two, three. Then she says, I already identified these two from a poster. Presumption, the way I've argued this case to the jury and in motions, is that she picked Mr. Tulin out of the poster. If you look to the poster, Kwasan, and she says, who's Kwasan when she's so in the poster? Kwasan's name floats between a person with a small afro and a person with dreadlocks. And so it's not entirely clear that she didn't pick Tulin. She never testified either to the FBI agent in September of 2012 or in the courtroom that Kwasan is who she, when she was given leading questions by defense counsel, she said, I picked Kwasan. I picked Kwasan. It's not clear who she's talking about. She has, it is certainly clear, Judge O'Grady made it clear on this trial record, that in front of her was the FBI spread and the poster. But she's not telling us which of the individuals is Kwasan that she's picking. Defense counsel didn't push this any harder. I want to make a point that she was cross-examined very extensively and first by Mr. Kwasan, who asked her if Mr. St. Louis was really the man in the photo spread and saying the man in the courtroom is not him. She adamantly said, the man in front of me is the one who abducted me. And so it's not beyond the scope. It was all fair under the rule. And then strategically, defense counsel for Mr. Tulin did not go that direction. Instead, she used a few series of questions about Kwasan, not making it clear to anyone who Kwasan is. I mean, I didn't go any further on redirect. That certainly could be blamed to me as well, because I knew I had the cooperator coming next who would identify, although that process became more protracted than I thought it would. Your Honor, if I could move to one other area, because we spent a lot of time here about the one word. I want to make a point. This court supervises a number of courthouses in a lot of district courts. In Alexandria, where this case was tried, the witness box is all the way removed from the jury. That's relevant to two of the points on appeal here. In other words, the word, to the extent it's being heard, would have to traverse the entire width of the courtroom, which is substantially bigger than this courtroom, and the jury is seated opposing them. It is not the witness who said the word rape. He could only speak Creole. It's the translator. Both I and Judge O'Grady thought the translator was keyed in, that we were using a word other than rape. But the Judge O'Grady said, I don't think the jury may have even heard it, because in Judge Mott's credit, asked me to lower my voice the last time I appeared before her. I can be very loud, and I was afraid of my record, and so I was repeating assault. Then the judge cured it, I believe, very competently like trial judges do, when the translator, not the witness. And then, Your Honor, it's also relevant because when Ms. Marcellin, the second victim, left the courtroom, it would have occurred with two tables filled with counsel, me standing at a podium, and the judge found there that he didn't believe the jury had seen that. I think those findings are better understood if the court appreciates that this is one of the courtrooms where the witnesses are not adjacent to the jury. And I want to make that point. It is true that Maggie Aubrin, Your Honor, Judge Diaz, I feel like you have a question. I don't want to miss that point, but I want to go back to this photo array. Okay, very well, Your Honor. I don't mean to waste all the time I have. I want to be sure that I understood your point. You seem to be suggesting that the appellants have misstated Ms. Fergal's testimony or statements about her identification with Mr. Tulin. At page 14 of their brief, they say, and I'm quoting them, notably when Ms. Fergal identified Mr. Tulin in the FBI photo array, she told the agent she expressly remembered having seen that photo of Tulin on the poster that the Haitian authorities showed her, something she may have told him before he even showed her the array. What's inaccurate about that? I'm sorry, Your Honor. That's the brief. That's not the joint appendix. The joint appendix of Special Agent Watson's testimony is that at the end of showing the photo spread, and he memorialized this in the 302, that she said, I've already identified them, those two people, in a poster. And that's recorded in the 302. And you say those two people included Mr. Tulin. Well, Your Honor, she only said those two people. And Tulin is not – And there's a problem with that croissant. Well, croissant is not on any of this. Croissant is only on the poster floating. The source of croissant, just to give the court the global view of the facts, there's a Haitian police report when they showed her the poster where they record that she identified St. Louis and croissant. What's unclear, and nobody could find the police officer who authored that report, what's unclear is who's croissant. Is croissant the man with the mini afro to the left, or is it the man with the dreadlocks to the right, who she says later, not that much longer, September of 2012, she's abducted in June of 2012, who she says later, I've already identified. So there's never been a non-identified in the sense of the photo spread. She only had directly identified the people, the cooperator corroborates it. And in the poster, what's unclear is who's croissant. She says that on the stand. If you were to review her testimony on cross with Ms. Cheney, there are only three or four questions, and she feeds her like four questions. You identified croissant, and she says, yes, yes, yes, yes, yes. There's no description to it. And then she says, who's croissant? And so it's unclear. But my point here, Your Honor, is Justice Ginsburg's decision in Perry I think is exactly on point. We don't take evidence from juries. We use cross-examination, and we explore all these confusions and all these points, and we let the juries in our system resolve the dispute between the parties as to what was seen. The jury saw her testimony. The jury saw the cooperator. The jury heard argument on this point. The jury saw the poster and the photo spreads and had all the other corroborating evidence because these are two kidnappings or abductions separated in time. They had all of that, and they resolved it. Justice Ginsburg says that is what we guarantee in our justice system. There is certainly confusion. The other point I would make, there's no protection to be given by suppressing the identification of this because the poster's display was unknown to the FBI until after their spread was shown, and the Haitians did it. There's no belief that this court's ruling one way or the other is going to affect the Haitians' behavior in the future. And so suppression is drastic. I would submit it's unreasonable in a situation where the victim we're speaking of was held for an entire week up close. They weren't wearing masks. She testified. That caused her to conclude she was going to be killed because why would you release a victim who saw your face for an extended period of time, was involved in negotiations, was talking to you face-to-face? Under that context, why would any court believe? This is not the bank teller. This is not the situation where a person's glancing through a Howard Johnson window. This is a situation where a victim believes they're going to be highly attentive, keen on what's going on, and for a very long period of time. We're not measuring it in seconds. We're not measuring it in minutes. And she makes the identification from a six-pack FBI photo spread, June abduction. She escapes after eight days. And then September of 2012, the dates on the photographs. We give you the exact date. She makes his selection. From what I believe the court concludes, certainly the district court did, and I believe the jury did, was a fair spread. There's nothing jarring about Mr. Tulin's appearance. The poster, Your Honor, I don't know what you do with that at the end of the day. But I would urge the court to, resting on our papers, affirm, hello, the word rape is unfortunate. It was clear right away. It was not part of the plan. It was not foreseeable. And the defendants on trial had nothing to do with it and were furious about it having occurred, which corroborated the detail that Mr. Tulin was the source of this family. He and Ms. Marsland corroborated that the cooperator was dealing with somebody through a door and that they were bringing money for a clinic, and he had told our cooperator the money was coming for a hospital. Those kind of details are richly corroborating. The victims were held for long periods of time with every incentive to pay attention to the appearance of their abductors. And to those facts, I would submit that this court should approve of the use of these photo spreads, should approve of the conduct of this trial, and find it to have been fairly done. Thank you, Your Honor. May it please the court, just to address some of the issues that the government responds to, going back to our brief on page 14, we do cite the opinion from the North District of Illinois where the court was very specific and lengthy in its writing that the possibility of a mistaken identification is increased where witnesses are shown collections of photos in which the picture of a single individual reoccurs. And I think we have this exact situation here. The risk of misidentification is high when someone is shown a picture over and over again. And in this particular case, we have information on a record that tells us that the witness was recalling seeing the prior photograph when she said, I remember seeing this picture in the wrap poster. We don't have to speculate about that. We don't have to guess about it. It is stated in the record, and we have that here. What do you do with the long period of captivity that preceded the identification in terms of the risk of misidentification? Well, I think it goes in favor of the defendant in this case, Your Honor, because in this particular case, the government is saying, and the only evidence, I mean, the only evidence that we have that Mr. Tulin was there is from Samson-Jolbois because Ms. Furgel at trial did not testify about Mr. Tulin being her captor. But if she was held and he was present and she was able to see her captors for these four or five days, then immediately when the Haitian police came in to pay this identification, she certainly could have picked out Mr. Tulin. And with respect to the government's argument that possibly Ms. Furgel was confused about the wrap poster, the government certainly didn't try to make that confusion clear in trial in any kind of way.  Because they had the opportunity to essentially ask her about an in-court identification. We still do not know why the government did not ask her to do an in-court identification for Mr. Tulin. And they certainly could have got her to explain. Because I understood their brief that talked about the difference in hairstyle and presence of the person then and now. I apologize, Your Honor. I didn't mean to interrupt. That wasn't actually coming out in testimony. That actually was a comment of the government in closing, Your Honor. That was not evidence actually in trial. It was the fact. It was an explanation maybe why they didn't ask her to make the identification. Your Honor, I would... We still don't know. That's what I would... And I would submit to the court that that could possibly be the case, but we still don't know. I mean, I have not been practicing as long as some other attorneys, but I've never had a case where the identification in court did not come in and it wasn't at least asked or tried. So we just don't know the answer. I believe my time has expired, so I would submit on a brief for the rest of the argument, Your Honor. Thank you very much. We will ask our clerk to adjourn court, and then we'll come down and say a little bit more.
judges: Diana Gribbon Motz, Albert Diaz, Robert J. Conrad Jr.